1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARTHUR PARNELL III,

           Plaintiff,

v.

A. TUCKER, et al.,

           Defendants.

_____

No. C 06-7662 SBA (PR)

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND MOTION
FOR SUMMARY JUDGMENT**

(Docket no. 26)

## INTRODUCTION

Plaintiff, a state prisoner incarcerated at Salinas Valley State Prison (SVSP) filed this pro se civil rights action under 42 U.S.C. § 1983 against SVSP staff and administrators, alleging a violation of his rights under the First Amendment and the Religious Land Use and Institutionalized Person's Act (RLUIPA).  Plaintiff seeks monetary relief from Defendants.

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. Defendants also move to dismiss certain claims for failure to exhaust administrative remedies. Plaintiff opposes Defendants' dispositive motions, and Defendants filed a reply.  For the reasons discussed below, Defendants' dispositive motions are GRANTED.

## PROCEDURAL BACKGROUND

On December 14. 2006, Plaintiff, a practicing Muslim, filed this action against the following Defendants: SVSP Captain A. Tucker[1]; SVSP Lieutenants Binkele and Krenke; SVSP Sergeants M. Thomas and S. Beguhl; and SVSP Correctional Officer A. Guirnalda.  Plaintiff asserted that restrictions on or prohibitions of his exercise of his Islamic religion, such as denying him access to the chapel or yard for congregational prayers and study, violated the Free Exercise Clause of the First Amendment and RLUIPA.

In an Order dated August 27, 2009, the Court found that Plaintiff stated cognizable claims under the First Amendment and RLUIPA against Defendants Tucker, Binkele, Beguhl and Thomas. (Aug. 27, 2009 Order at 3-5.)  However, the Court found that Plaintiff failed to allege any claims

---

[1] Plaintiff lists Defendant Tucker as an associate warden at SVSP; however, in August, 2004, Defendant Tucker was the yard captain at Facility A.

1   against Defendants Krenke and Guirnalda, and all claims against these Defendants were dismissed

2   without prejudice.

3         The Court ordered the United States Marshal to serve Defendants Tucker, Binkele, Beguhl

4   and Thomas.

5         Before the Court are dispositive motions filed by Defendants Tucker, Binkele, Beguhl and

6   Thomas (docket no. 26).  Defendants move for summary judgment on all claims on the grounds that

7   no triable issue of material fact exists, that qualified immunity protects them from liability for the

8   acts alleged in the complaint, and that they are entitled to judgment as a matter of law.  In the

9   alternative, Defendants move to dismiss for Plaintiff's failure to properly exhaust his administrative

10  remedies as to his claims against Defendants Binkele and Beguhl.

11        Plaintiff has filed an opposition to Defendants' dispositive motions, and he has also filed a

12  Statement of Disputed Facts.

13        Defendants have filed their reply to Plaintiff's opposition.

                            **FACTUAL BACKGROUND**

14
15        The following facts are undisputed unless otherwise noted.

16        Plaintiff was at all times relevant to the complaint a practicing Muslim, and he was housed

17  in Facility A at SVSP.  (Compl. at 3a-3b.)[2]  In 2004, Facility A was the "Special Needs Yard" at

18  SVSP for "Level IV" inmates.  (Thomas Decl. ¶ 3.)  Level IV inmates require the highest level of

19  security of all inmates at SVSP.  (Id.)  They received the same programming as "general

20  population" inmates.  However, they were housed on the Special Needs Yard because they were

21  "not suited for housing in the general population" due to various reasons, including "the presence of

22  enemies in general population, the inmate has notoriety likely to result in great bodily harm if the

23  inmate is placed in general population, or for other reasons requiring special protection for the

24  inmate."  (Id.)  Level IV inmates are allowed access to "the prison exercise yard, the prison canteen,

25  educational programs, and religious services" unless "a prison lockdown was in place, or some

26  other incident caused the normal operation of the program to be suspended, such as an emergency

27
28

United States District Court
For the Northern District of California

---

[2] Plaintiff attached three additional pages to page three of his complaint; therefore, the Court
has labeled the four pages as 3a through 3d.

2

United States District Court

For the Northern District of California

1    or other incident."  (Id.)

2        Religious services are always conducted in the program area, and each facility program area

3    has its own chapel.  (Id. ¶ 5.)  In Facility A, the chapel "is large enough for approximately 90

4    inmates."  (Id.)  For security reasons, inmates must be supervised by "either non-custody or custody

5    staff" whenever they are in the chapel in a group.  (Id.)  Additionally, any group activity taking

6    place on the prison's recreation yard must be approved by the Facility Lieutenant and by the prison

7    chaplain.  (Id. ¶ 6.)  Without approval, "any group of three or more inmates on the yard is instructed

8    to disperse by the yard officers."  (Id.)

9        Chaplain A. Landau has served as the Muslim Chaplain at SVSP since 2007, and he has

10   been a "volunteer chaplain for prison inmates for nearly twenty years."  (Landau Decl. ¶ 2.)

11   Chaplain Landau is responsible for "counseling, managing and providing religious services" at

12   SVSP.  (Id.)  According to Chaplain Landau, a follower of the Muslim faith prays five times a day,

13   each day of the week, as follows:

14
         Each prayer is divided into two portions; each portion is a rakat.  The first prayer is
15       the Fajr prayer and is performed before sunrise.  The second prayer is the Dhur
         prayer which is performed after the zenith of the sun, which occurs at
16       approximately 12:00 p.m.  The Dhur prayer is followed by the Asr prayer, called
         the "evening" prayer.  The fourth prayer is the Magrib prayer performed in the
17       later evening after sunset.  The fifth and final prayer is the Isha prayer which is
         performed just before going to bed.  All of the prayers may be performed in a
18       congregation or with other followers of the Muslim faith, but any follower may
         perform their prayers alone.  No religious penalty will be incurred for not
19       performing prayer with a group of other followers.

20   (Id. ¶ 3.)  On Fridays, the second prayer of the day, the Dhur prayer, is performed with a

21   congregation of other followers of the Muslim faith.  (Id. ¶ 4.)  This prayer is then called the

22   Jumu'ah, or congregation prayer, because Jumu'ah means "congregation of worship."  (Id.)

23   According to Chaplain Landau "there is no compulsion or restraint in the Muslim religion, if a

24   follower is unable to congregate for the Jumu'ah prayer, he may simply perform the Dhur prayer."

25   (Id.)  Consequently, Chaplain Landau maintains, if a follower of the Muslim faith is unable to

26   congregate for the Jumu'ah prayer, he may perform the Dhur prayer alone," and practicing the

27   Muslim faith in this manner "does not violate the tenets of Islam."  (Id.)  According to Plaintiff,

28   "Chaplain Landau is wrong and shouldn't push his methodology on another inmate."  (Pl.'s State. of

                                               3

United States District Court
For the Northern District of California

1    Disputed Facts at 3.)  Plaintiff claims that he is a "Sunni Muslim (one [that] practices the sunnah)"

2    and that Chaplain Landau "practices his version of tenants based on Ibn Qavvim and Ibn

3    [Taimiyah],[3] both of whom the major schools and scholars reject the majority of their teachings."

4    (Id. at 4.)  Thus, Plaintiff claims that the Muslim faith he practices requires him to participate in

5    Jumu'ah services with other Muslims every Friday.  (Id.)  Plaintiff further claims his inability to

6    attend Jumu'ah services created impediments that prevented him from practicing and performing

7    the duties of his faith, stating:

8          The spiritual benifits [sic] of congregational prayer weight the benifits [sic] of
           being in violation of not following the sunnah.  To take away a sincere Muslim's
9          opportunity to obtain spiritual rewards, which will weigh in his favor during
           judgment [sic], was done out of malice and can not [sic] be allowed to be excused.
10

11   (Id.)

12         Ramadan is the ninth month of the Islamic calendar.  (Landau Decl. ¶ 6.)  According to

13   Chaplain Landau, "[i]t is the Islamic month of fasting, in which participating Muslims refrain from

14   eating, drinking, smoking, and indulging in anything that is in excess or ill-natured; from dawn

15   until sunset."  (Id.)  Ramadan "is a time for Muslims to fast for the sake of God and to offer more

16   prayer than usual."  (Id.)  Chaplain Landau describes the schedule of fasting and prayers, as

17   follows:

18         Every day during the month of Ramadan, Muslims around the world get up before
           dawn to eat Suhoor, then they perform the Fajr prayer.  They have to stop eating
19         and drinking before the Fajr prayer until the fourth prayer of the day, Magrib.
           Muslims break their fast at Magrib, or sunset, prayer time with a meal called Iftar,
20         meaning "breakfast."  Muslims may continue to eat and drink after the sun has set
           until the next morning's Fajr prayer call.  Then the process starts all over.  While
21         the Iftar meal is often a social event, where Muslims break their fasts together,
           there is no requirement in Islam to congregate for Iftar, or for the Magrib prayer
22         occurring at sunset.

23   (Id. ¶ 7.)

24         Plaintiff alleges Defendants violated his rights under the First Amendment and RLUIPA

25   during October and November of 2004.  Specifically, Plaintiff claims that "[f]rom October 15, 2004

26   until November 4, 2004, [he] was denied the right to practice his religion."  (Compl. at 3c.)

27         Plaintiff claims that on August 6, 2004, he submitted a special activity packet for approval

28

_____

[3] Plaintiff mis-spelled as Taimiyah as Tamiya.

4

United States District Court
For the Northern District of California

"per CDC Rules and Regulations as well as the Department of Operation Manual" so that "the Muslims on A yard could participate in Ramadan." (Id. at 3a.)  Plaintiff alleges that the special activity packet was approved by prison officials, including Defendant Tucker.  Part of the religious activities involved pre-approved group prayer.  (Id.)

On October 12 or 13, 2004, Plaintiff gave SVSP prison officials "an approved copy of the special activity packet." (Id. at 3a.)

On October 14, 2004, Plaintiff and several other Muslims "were released after yard recall to perform [their] congregational prayers and study per the special activity packet." (Id. at 3b.)  Defendant Knuckles informed Defendant Tucker that she was "going to be providing coverage" during their services.  (Id.)

On October 15, 2004, which was a Friday, Defendant Thomas was instructed to open the Facility A chapel for scheduled Jumu'ah prayer services.  (Thomas Decl. at 7.)  At that time, Defendant Thomas believed that an imam[4] would be present to supervise the inmates in the chapel during Jumu'ah.  (Id.)  Plaintiff alleges Defendant Tucker instructed Defendant Thomas "not to allow [Plaintiff and the other Muslims] to hold [their] approved services if the [i]mam wasn't present." (Id. at 3b.)  The imam did not arrive until after the time for the scheduled services; therefore, Defendant Thomas did not release the Plaintiff and the other Muslim inmates to perform their services in the chapel.  (Thomas Decl. ¶ 7.)  Plaintiff claims that "the Islamic Chaplain had already stated that [they] should at least be given the yard or chapel for services in his absence . . . [and that] Plaintiff Parnell was qualified to lead Jumu'ah prayer . . . ." (Pl.'s State. of Disputed Facts at 2.)  Defendant Thomas acknowledges that he made an "error" when he did not allow Jumu'ah services on October 15, 2004 "in that a correctional officer or other custody staff could have been provided for supervision of the services instead of the Muslin Chaplain." (Thomas Decl. ¶ 10.)  However, Defendant Thomas claims he made the error "based upon the need to maintain the security of the institution by ensuring supervision of any group of inmates in the chapel, and to protect the safety of staff and inmates." (Id. ¶ 12.)  Defendant Thomas claims that "[l]ater during

---

[4]  Similar to spiritual leaders, the imam is the one who leads the prayer during Islamic gatherings.

the Ramadan month, Jumu'ah services were conducted with custody-staff supervision in the chapel, in accordance with the clarified instructions from [his] supervisors." (Id.)  As further explained below, Plaintiff disputes this and claims that "[f]rom 10-15-04 until 11-4-04, [they] where [sic] denied access to the chapel to perform [their] prayers." (Pl.'s State. of Disputed Facts at 7.)

On October 16, 2004, Plaintiff claims that the imam "came to see [him] to ask why [they] weren't in the chapel." (Compl. at 3b.)  Plaintiff alleges that he spoke with Defendant Krenke about his lack of access to the chapel and to "see why they were violating the approved packet." (Id.)  Plaintiff alleges Defendant Krenke instructed Defendant Thomas to "go get the chapel keys so [they] could have [their] services];" however, Defendant Thomas refused.  (Id.)

Also on October 16, 2004, SVSP staff was preparing to release Plaintiff and the other Muslim inmates for group Ramadan Magrib services and the meal to break their fast, when an alarm sounded in Facility B.  (Thomas Decl. ¶ 9.)  The emergency involved a riot in the gym, and prison staff from Facility A responded to the alarm.  (Id.)  After control was regained, an emergency count was conducted requiring all inmates to remain in their cells.  (Id.)  After the count, the Muslim inmates were issued sack lunches to replace the Magrib meal.  (Id.)  Plaintiff disputes the timing of the aforementioned events on October 16, 2004.  (Pl.'s State. of Disputed Facts at 7.)  Plaintiff claims that he had "finished cooking and loading up the food so as to cell feed the participating Muslims thirty minutes prior to the emergency count . . . [and that the] actual emergency count took place about four (4) hours after [they] where [sic] denied [their] services." (Id.)

Between October 18, 2004 and October 26, 2004, Plaintiff was told by Defendant SVSP Lieutenant Binkele that "he wasn't going to allow Plaintiff to hold Jummu'ah [sic] on the yard." (Compl. at 3d (footnote added).)

Finally, Plaintiff claims that on November 13, 2004, Defendant SVSP Sergeant S. Beguhl "denied Plaintiff access to hold services on the yard." (Id.)

On October 17, 2004, Plaintiff submitted a 602 inmate appeal log no. SVSP-04-3991, identifying prison staff who violated the special activity packet that allowed him to conduct Ramadan observance and celebration in October, 2004.  Specifically, Plaintiff alleged that on

6

October 15, 2004, Defendants Tucker and Thomas were responsible for failing to allow him and other Muslim inmates to participate in group prayer services, in violation of Plaintiff's rights under the First Amendment and RLUIPA.  (Young Decl., Ex. D at AGO-15.)  On October 16, 2004, Plaintiff claims that Defendant Thomas "refused to let out the muslim population for evening services per the signed packet," and that at around 9:00 p.m. when the were ready to break their fast, "all [their] hot food had been thrown out, and . .  all that [they] had left was the suhoor (morning meal)."  (Id. at AGO-17.)  Plaintiff requested monetary compensation from Defendants.

On October 21, 2004, Plaintiff's appeal was received.  It was bypassed at the informal level of review, thus he appealed it to the first level of review.  (Id.)

On October 22, 2004, Abdul Malik Saafir, another Muslim Chaplain at SVSP, completed an informational chrono addressed to Plaintiff as well as the Facility Captains, Lieutenants, and Sergeants explaining that Plaintiff was authorized as an inmate leader of Friday Jumu'ah prayer services when he was unavailable due to his obligations to supervise other facilities at the prison. (Young Decl., Ex. E at AGO-25.)

On November 9, 2004, SVSP Sergeant R. Mojica interviewed Plaintiff regarding the appeal. (Id. at AGO-19.)  On November 23, 2004, Sergeant Mojica denied the appeal because Plaintiff "ha[d] not provided sufficient evidence to substantiate his claims of illegal activity . . . [and because he] failed to prove that any decisions made by staff were with malice."  (Id. at AGO-21.)  Sergeant Mojica determined that "[s]taff acted professionally, and always kept in mind the safety and security of staff, inmates and the institution."  (Id.)

Plaintiff next filed his appeal at the second level of review.  Lieutenant Krenke, was assigned to investigate the appeal.  (Id. at AGO-23.)  On January 26, 2005, the appeal was partially granted by SVSP Chief Deputy Warden L. E. Scribner.  (Id. at AGO-24.)  Relying upon SVSP's Operational Procedures, the California Code of Regulations, and the Department Operations Manual, Warden Scribner responded to the appeal as follows:

> The appellant has failed to provide evidence not has this investigation discovered any information which would substantiate the appellant's allegations.  The fact that the appellants were not allowed access to the Chapel is correct but was a staff error

7

which was corrected.  This was simply a mistake and Facility staff are taking case to ensure this error does not happen in the future.

The allegation that the food was thrown out without cause is not correct.  The food was discarded due to Food Services determination that it was not fit for human consumption due to the time which it had been sitting out.  The original appellant was one of the inmates who is documented as asking for sack lunches as a replacement meal.  The appellant did not make any type of objections at that time.

The appellants['] request for monetary compensation is beyond the scope of the Inmate Appeals Process.  The appellant's [sic] shall be allowed to practice their chosen religions.  However, when granting access to rooms, buildings, etc., the safety and security of inmates, staff and this institution shall take precedence.

(Id.)

Plaintiff pursued his appeal to the final level of review, the Director's Level of review.  On May 19, 2005, the appeal was denied by N. Grannis, Chief of the Inmate Appeals Branch.  (Id. at AGO-13-AGO-14.)  Chief Grannis interviewed Lieutenant Krenke "to clarify the Second Level appeal response."  (Id. at AGO-13.)  She states that Lieutenant Krenke "stated that the staff communication error was 'corrected' when, after approximately 7 to 10 days after the start of Ramadan and denial of chapel use, the chapel was opened with custody supervision and Muslim inmates were allowed to conduct their religious service."  (Id.)  Chief Grannis further noted:

It is apparent that pre-approved accommodations for the practice of Ramadan services were ineffectively communicated and effected on "A" Facility in October 2004.  The institution must ensure that pre-approved religious events are implemented as designed barring significant safety and/or security concerns.  The staff error was acknowledged and corrected.  The ineffective implementation was aggravated by an emergency response of several hours duration [due] to a riot in another unit and a subsequent emergency count.  Culinary staff determined that the cooked enchiladas, prepared for the religious observation, had sat for too long to ensure safe consumption.  The food was destroyed and sack lunches were issued, reportedly at the appellant's request.  The circumstances were extremely unfortunate.  The CDC endorses the right to religious observance consistent with legitimate security and safety.  The meal event was interrupted by an inmate-generated riot that required staff from "A" Facility to respond.  The circumstances controlled the decisions regarding the prepared meal.  In view of the institution's acknowledgment and correction of the staff error that prohibited access to the chapel in violation of a pre-approved procedure, no further action is required.

(Id.)

**DISCUSSION**

**I.    Motion to Dismiss**

8

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants assert that Plaintiff's claims against Defendants Beguhl and Binkele should be dismissed because Plaintiff failed to exhaust his administrative remedies against them. In support of the motion to dismiss, Defendants have submitted a declaration by Kathleen Ochoa, SVSP Case Records Manager.[5] Defendants have also submitted a copy of the printout of the search result of Plaintiff's computerized records in the Inmate Appeals Branch, copies of the appeals decisions at all levels regarding Plaintiff's inmate appeal log no. SVSP-04-3991. (Young Decl., Ex. B, D.) Ms. Ochoa states that the submitted exhibits are accurate copies of what they purport to be. (Id., Ex. A.)

### 1.    **Applicable Law**

The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and no longer left to the discretion of the district court. Woodford v. Ngo, 548 U.S. 81, 84 (2006) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)). "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." Id. Even when the relief sought cannot be granted by the administrative process, i.e., monetary damages, a prisoner must still exhaust administrative remedies. Id. at 85-86 (citing Booth, 532 U.S. at 734).

"The text of 42 U.S.C. § 1997e(a) strongly suggests that the PLRA uses the term 'exhausted' to mean what the term means in administrative law, where exhaustion means proper exhaustion." Id. at 2387. Therefore, the PLRA's exhaustion requirement requires "proper exhaustion" of available administrative remedies. Id. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 2386

---

[5] Ms. Ochoa's declaration is attached to the declaration filed by Defendants' counsel, Deputy Attorney General Christopher M. Young.

United States District Court
For the Northern District of California

(footnote omitted).  In other words, the PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal."  Id. at 2382.  Furthermore, administrative remedies may not be exhausted where the grievance, liberally construed, does not have the same subject and same request for relief.  See generally O'Guinn v. Lovelock Correctional Center, 502 F.3d 1056, 1062-63 (9th Cir. 2007) (even with liberal construction, grievance requesting a lower bunk due to poor balance resulting from a previous brain injury was not equivalent to, and therefore did not exhaust administrative remedies for, claims of denial of mental health treatment in violation of the ADA and Rehabilitation Act).

The State of California provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  See id. § 3084.1(e).  In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a CDC 602 inmate appeal form, (3) second level appeal to the institution head or designee, and (4) third level appeal to the Director of the CDCR.  Id. § 3084.5; Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  This satisfies the administrative remedies exhaustion requirement under § 1997e(a).  Id. at 1237-38.  A prisoner need not proceed further and also exhaust state judicial remedies.  Jenkins v. Morton, 148 F.3d 257, 259-60 (3d Cir. 1998).

Administrative remedies may not be exhausted where the grievance, liberally construed, does not have the same subject and same request for relief.  See generally O'Guinn, 502 F.3d at 1063 (even with liberal construction, grievance requesting a lower bunk due to poor balance resulting from a previous brain injury was not equivalent to, and therefore did not exhaust administrative remedies for, claims of denial of mental health treatment in violation of the ADA and Rehabilitation Act).

Nonexhaustion under § 1997e(a) is an affirmative defense.  Jones v. Bock, 549 U.S. 199, 217-18 (2007); Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  Defendants have the

1    burden of raising and proving the absence of exhaustion, and inmates are not required to

2    specifically plead or demonstrate exhaustion in their complaints.  <u>Jones</u>, 549 U.S. at 215-17.

3        **2.    <u>Analysis</u>**

4        Plaintiff alleges that Defendant Binkele did not allow him to congregate with other Muslim

5    inmates on the prison yard for prayer services between October 18 and 26, 2004.  (Compl. at 3d.)

6    Plaintiff further alleges that  Defendant Beguhl "denied him access to hold services on the yard" on

7    November 13, 2004.  (<u>Id.</u>)  Defendants argue that Plaintiff did not exhaust either of these claims,

8    because he did not include them in SVSP-04-03991, or in any other inmate appeal.  (Decl. Young

9    Ex. B, D.)  The only allegation that Plaintiff included in SVSP-04-03991 is that prison officials

10   cancelled Jumu'ah prayer services in the prison chapel on October 15, 2004, and cancelled the

11   Magrib prayer as well as their meal in response to a prison alarm on October 16, 2004.  (<u>Id.</u>, Ex. D.)

12       As mentioned above, Defendants cite inmate appeal SVSP 04-3991 in support of their

13   argument.  Plaintiff states the following, which is included in his initial appeal in SVSP 04-3991:

14   "On October 15, 2004, the second day of our fast, Captain Tucker and Sgt. Thomas (A) refused to

15   allow us to practice our religion per the special events packet that had been signed by the Captain

16   himself."  (<u>Id.</u>)  The appeal further states that on October 16, 2004, "Sgt. Thomas refused to let out

17   the muslim population for evening services per the signed packet."  (<u>Id.</u>)  The Court notes that

18   nowhere in Plaintiff's administrative appeal did he mention Defendants Beguhl and Binkele or

19   allege that these Defendants were present on either October 15 or 16, 2004.  In the federal

20   complaint, Plaintiff alleges that Defendants Binkele and Beguhl did not allow him to congregate

21   with other Muslim inmates on the prison yard for prayer services between October 18 and 26, 2004,

22   and on November 13, 2004, respectively.  However, Defendants Beguhl and Binkele were not

23   mentioned in SVSP-04-3991; therefore, Plaintiff's claims against them were not properly exhausted

24   in that appeal.

25       The Court finds unavailing Plaintiff's argument that he "could not file a 2nd appeal as it

26   would be deemed a duplicative appeal."  (Opp'n at 9.)  Plaintiff has not provided any evidence that

27   he had filed any appeal (relating to his claims against Defendants Beguhl and Binkele) that had

28

been denied as duplicative.  Instead, in support of his argument, Plaintiff has attached his inmate appeal log no. SVSP 03-3413.  (Opp'n, Ex. A.)  However, that appeal was filed on August 30, 2003.  (Id.)  While SVSP-04-3991 also relates to Plaintiff not being allowed to participate in Jumu'ah services, this appeal was completed when it was eventually resolved at the Director's level on April 5, 2004.  (Id.)  Plaintiff's claims against Defendants Beguhl and Binkele stemmed from incidents that occurred almost six months after SVSP-04-3991 had been resolved.  Thus, it is unreasonable for Plaintiff to rely on SVSP-04-3991 to support his argument that he "met the exhaustion requirements" as to his claims against Defendants Beguhl and Binkele.  If Plaintiff is claiming that SVSP's administrative remedies were inadequate to exhaust his claims against Defendants Beguhl and Binkele, such conclusory allegations are insufficient to defeat dismissal for failure to exhaust.  White v. McGinnis, 131 F.3d 593, 595 (6th Cir. 1997).  Plaintiff's claims against Defendants Beguhl and Binkele are therefore unexhausted under the PLRA; therefore, they are DISMISSED without prejudice.  Accordingly, Defendants' motion to dismiss these claims is GRANTED.

**II.**      **Motion for Summary Judgment**

      **A.**      **Legal Standard for Summary Judgment**

      Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  See id.

      The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out that

United States District Court

For the Northern District of California

"there is an absence of evidence to support the nonmoving party's case." Id.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.  However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory." Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Liberty Lobby, 477 U.S. at 248.  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." Celotex Corp., 477 U.S. at 323.  At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party:  if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  A court may not disregard direct evidence on the ground that no reasonable jury would believe it. See id. (where nonmoving party's direct evidence raises genuine issues of fact but is called into question by other unsworn testimony, district court may not grant summary judgment to moving party on ground that direct evidence is unbelievable).  The district court may not resolve disputed issues of material fact by crediting one party's version of events and ignoring another. Wall v. County of Orange, 364 F.3d 1107, 1111 (9th Cir. 2004) ("By deciding to rely on the defendants' statement of fact [in deciding a summary judgment motion], the district court became a jury.").

The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996). If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. See id.; see, e.g., Carmen v. San Francisco Unified Sch. Dist., 237 F.3d

13

1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence).  Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so.  Id. at 1029.  "The district court need not examine the entire file for evidence establishing a genuine issue of fact."  Id. at 1031.

A verified complaint may be used as an opposing affidavit under Rule 56(e), as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge); see also Keenan v. Hall, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (treating allegations in prisoner's verified amended complaint as opposing affidavit).  Like a verified complaint, a verified motion -- or in this case Plaintiff's verified "Statement of Disputed Facts" -- functions as an affidavit.  See Johnson v. Meltzer, 134 F.3d 1393, 1400 (9th Cir. 1998).  An affidavit is "cognizable to establish a genuine issue of material fact so long as [it] state[s] facts based on personal knowledge and is not too conclusory."  Rodriguez, 265 F.3d at 902.

**B.   Legal Claims**

**1.   Free Exercise Claim**

Plaintiff claims that his First Amendment right to free exercise of religion was violated by remaining Defendants Thomas and Tucker for denying him access to the chapel to participate in Jumu'ah and Ramadan Magrib services in October, 2004.

The First Amendment guarantees the right to the free exercise of religion.  Cruz v. Beto, 405 U.S. 319, 323 (1972).  "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  O'Lone v. Shabazz, 482 U.S. 342, 348 (1987).  In order to establish a free exercise violation, a prisoner must show that the defendant burdened the practice of his religion, by

14

1  preventing him from engaging in conduct mandated by his faith, without any justification

2  reasonably related to legitimate penological interests.  Freeman v. Arpaio, 125 F.3d 732, 736 (9th

3  Cir. 1997).  To reach the level of a constitutional violation, "the interference with one's practice of

4  religion must be more than an inconvenience; the burden must be substantial and an interference

5  with a tenet or belief that is central to religious doctrine."  Id. at 737 (quoting Graham v. C.I.R., 822

6  F.2d 844, 851 (9th Cir. 1987)).  A prisoner may be inconvenienced in the practice of his or her faith

7  so long as the governmental conduct does not prohibit the prisoner from "participating in the

8  mandates of his religion."  See Freeman, 125 F.3d at 737.

9      A restriction on an inmate's First Amendment religious rights is valid if it is reasonably

10  related to legitimate penological interests.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 349

11  (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).  The burden is on the prison officials to

12  prove that the restriction of the prisoner's exercise of religion was reasonably related to a legitimate

13  penological objective.  See Ashelman v. Wawrzaszek, 111 F.3d 674, 677-78 (9th Cir. 1997)

14  (applying test from O'Lone and Turner to determine reasonableness of decision denying Jewish

15  prisoner's request for an all-kosher diet).  In making such a determination, the court should consider

16  four factors:

17  

18      First, there must be a valid, rational connection between the prison
       regulation and the legitimate governmental interest put forward to
19      justify it, and the governmental objective itself must be a legitimate and
       neutral one.  A second consideration is whether alternative means of
20      exercising the right on which the regulation impinges remains open to
       prison inmates.  A third consideration is the impact accommodation of
21      the asserted right will have on guards, other inmates, and the allocation
       of prison resources.  Finally, the absence of ready alternatives is
22      evidence of the reasonableness of a prison regulation.

23  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).

24      Plaintiff alleges that his participation in Jumu'ah services with other Muslims every Friday

25  is a central tenet of his faith.  (Pl.'s State. of Disputed Facts at 3.)  The assertions in Plaintiff's

26  Statement of Disputed Facts constitute evidence the Court can consider in ruling on the motion for

27  summary judgment, because it is verified (signed under penalty of perjury).  See Fed. R. Civ. P.

28  56(e) (setting forth evidentiary requirements for supporting and opposing summary judgment

15

United States District Court
For the Northern District of California

motion); Fed. R. Evid. 901 (requiring authentication or identification as a condition precedent to admissibility of evidence); see also Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (allowing verified complaint to function as opposing affidavit under Rule 56 if based on personal knowledge and sets forth specific facts admissible in evidence).

By contrast, Chaplain Landau, in his declaration in support of the motion for summary judgment, attests to the following admissible evidence: "if a follower of the Muslim faith is unable to congregate for the Jumu'ah prayer, he may perform the Dhur prayer alone," and practicing the Muslim faith in this manner "does not violate the tenets of Islam." (Landau Decl. ¶ 4.)

In sum, Plaintiff has put forth admissible evidence sufficient to create a genuine issue of material fact as to whether attending congregational Jumu'ah services every Friday, rather than simply fulfilling the obligation to perform the Dhur prayer every day, is mandated by the Muslim faith. See O'Lone, 482 U.S. at 345 (citing to record therein; finding record established prisoners' sincerely held religious beliefs compelled attendance at Jumu'ah services).

However, even if Plaintiff has presented evidence to support his allegations that Defendants Thomas and Tucker prevented him from engaging in conduct mandated by his religion,[6] no violation of his First Amendment rights can be made out if the restriction was reasonably related to legitimate penological objectives. See id. at 349 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). As mentioned above, the Supreme Court has identified four factors for courts to consider when determining whether a regulation is reasonably related to legitimate penological interests. See Turner, 482 U.S. at 89-90.

The task in considering the Turner factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one. Beard v. Banks, 548 U.S. 521, 533 (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to

---

[6] The Court notes that Plaintiff has not put forth admissible evidence sufficient to create a genuine issue of material fact as to whether attending group Ramadan Magrib services is mandated by the Muslim faith. Because Defendants fail to argue otherwise, the Court will assume arguendo that it is a central tenet of his faith.

matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities.  See id. at 528.  Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. Id.

Here, with respect to the first Turner factor, Defendants Thomas and Tucker assert they were unable to allow Plaintiff to participate in Jumu'ah services with other Muslims on Friday, October 15, 2004 because of Defendant Thomas's belief that the Muslim Chaplain had to be present to supervise the service.  Due to the high level of security required for Facility A Level IV inmates, Defendant Thomas believed the prisoners could not gather for Jumu'ah services unsupervised. While Defendant Thomas may have been mistaken in believing that the Ramadan program included supervision only by the Muslin Chaplain, he claims that it was made in "good-faith," stating:

> I did not prevent the Jumu'ah group worship in the chapel for any other reason that my good-faith belief that the Muslim Chaplain was planning to attend services that day and supervise the inmates himself, and that his presence was a requirement of the pre-approved Ramadan program.  My decision was based upon the need to maintain the security of the institution by ensuring supervision of any group of inmates in the chapel, and to protect the safety of staff and inmates.

(Thomas Decl. ¶ 12.)  Indeed, the Court finds that the record shows that while the requirements of the Ramadan program were mis-communicated to facility staff, the error was quickly corrected. (Id. ¶ 11-12; Young Decl., Ex. D at AGO-13.)  Meanwhile, on October 16, 2004, the emergency alarm which occurred on that same date (resulting in the cancellation of the group Ramadan Magrib services and their meal) was a legitimate security concern that justified suspension of normal programming.  Plaintiff's argument regarding an error of the timing as to when the "actual emergency **count**" took place (i.e., he claims it occurred "four hours" after they were denied group Magrib prayer service) is irrelevant.  (Pl.'s State. of Disputed Facts at 7.)  The record indicates that "when staff were [sic] preparing to release Plaintiff Parnell and other approved Muslim inmates for group Ramadan Magrib services and the meal to break their fast, an alarm sounded in Facility B because of a riot in the gym."  (Thomas Decl. ¶ 4.)  Plaintiff acknowledges that the prison was in a state of emergency on October 16, 2004, and he does not dispute that there indeed was a riot that

17

**United States District Court**
For the Northern District of California

1    took place.  Furthermore, Plaintiff does not dispute the need for high security for Facility A Level

2    IV inmates.  Therefore, it is evident that all normal programming was suspended due to security

3    concerns and programming was not reinitiated until after the emergency count cleared.  Moreover,

4    the record shows that as soon as the count cleared, Defendant Thomas instructed the prison dining

5    staff to replace the missed Iftar meal with sack lunches.  Accordingly, the Court finds Defendants

6    Thomas and Tucker have satisfied the first element of the Turner test, in that they have shown a

7    logical connection between their aforementioned actions of not allowing Jumu'ah or Ramadan

8    Magrib services for Facility A Level IV inmates during the time period mentioned above and the

9    legitimate need for ensuring prison security.  See O'Lone, 482 U.S. at 350 (finding policy not

10   allowing inmates to return from outside work detail to attend Jumu'ah services logically connected

11   to prison's legitimate security and administrative concerns).

12        As noted, the second Turner factor is "whether there are alternative means of exercising the

13   right that remain open to prison inmates."  Turner, 482 U.S. at 89-90.  In O'Lone, the Supreme

14   Court upheld a prison regulation that precluded prisoners from returning mid-day for Jumu'ah

15   prayer services, where those prisoners were part of a work-gang detailed on assignments outside of

16   the prison.  See O'Lone, 482 U.S. at 349.  The Supreme Court found that although there were no

17   alternative means for the prisoners to attend Jumu'ah services, the prisoners nevertheless retained

18   their ability to participate in other Muslim religious ceremonies and practices, and that such ability

19   supported the reasonableness of the restriction.  Id. at 352-53.  Here, even though Plaintiff alleges

20   that he could not attend Jumu'ah and Ramadan Magrib services during the time periods at issue, it is

21   not disputed he retained the ability to pray in his cell, and to practice other aspects of his religion.

22   Accordingly, the Court finds Defendants Thomas and Tucker have satisfied the second element of

23   the Turner test.

24

25        With respect to the third Turner factor, the evidence before the Court demonstrates that

26   Defendants Thomas and Tucker's actions in not allowing Jumu'ah and Ramadan Magrib services for

27   Facility A Level IV inmates during the time periods at issue was reasonable in light of the impact

28   the accommodation of Plaintiff's asserted right to such services would have on the allocation of

**United States District Court**
For the Northern District of California

1  prison resources generally.  According to the undisputed evidence, on October 15, 2004, Defendant

2  Thomas noted that there was no qualified Muslim Chaplain to preside over Jumu'ah services, and

3  because he believed staffing was inadequate to secure the chapel, he did not allow services to be

4  held when the Muslim Chaplain was unavailable.  (Thomas Decl. ¶ 12)  Again, even if Defendant

5  Thomas made a good-faith mistake, allowing the Jumu'ah services on October 15, 2004 would not

6  have reduced the need for prison officials to allocate prison staff to supervise the services, because

7  Facility A Level IV inmates must be supervised at all times.  Consequently, prison officials could

8  reasonably conclude that such allocation would have created a staff shortage and could possibly

9  lead to problems in other parts of the prison.

10       As to the incident on October 16, 2004, it would clearly have had an adverse impact on

11  prison resources to accommodate one group of inmates' prayer service during a state of emergency

12  resulting from a riot and during the emergency count.  While it resulted in the suspension of normal

13  programming, and thus group Ramadan Magrib services, that day, the Court finds this is the most

14  efficient way to handle an emergency situation is to suspend the program until the emergency is

15  under control.

16       As to the fourth Turner factor, and again only referring to the incident on October 16, 2004,

17  the "regulations" at issue are those that require the cancellation of all programs in an event of an

18  emergency or any other threat to prison safety or security.  The aforementioned difficulties that

19  could have arose had Defendants Thomas and Tucker not decided to follow the regulation and

20  cancel all normal programing, including group Ramadan Magrib services, make clear that there

21  were no "obvious, easy alternatives" to the regulations they adopted.  See O'Lone, 482 U.S. at 353.

22  Accordingly, the Court finds Defendants Thomas and Tucker have satisfied the third and fourth

23  elements of the Turner test.

24       In sum, for the reasons discussed above, the Court concludes Defendants Thomas and

25  Tucker have shown a reasonable relation between their actions of not allowing Jumu'ah and

26  Ramadan Magrib services at Facility A during the time periods at issue, and legitimate penological

27  objectives.  Accordingly, Defendants Thomas and Tucker are entitled to summary judgment on

28

19

1    Plaintiff's First Amendment claim.

2              **2.    RLUIPA Claim**

3         RLUIPA provides that no state may impose a "substantial burden" on a prisoner's exercise

4    of religion unless the action or policy in question provides the least restrictive means of serving a

5    compelling governmental interest. 42 U.S.C. § 2000cc-1(a).  In order to state a claim under

6    RLUIPA, the plaintiff bears the burden of coming forward with evidence demonstrating the state's

7    action or policy constituted a substantial burden on his exercise of religion.  Warsoldier v.

8    Woodford, 418 F.3d 989, 994-95 (9th Cir. 2005).  The focus of this initial inquiry necessarily is on

9    the manner in which the plaintiff's religious exercise is impacted, rather than on the reasonableness

10   of the facility's policy or regulation.  Id. at 995.

11        RLUIPA does not define "substantial burden."  See 42 U.S.C. § 2000cc-5.  The Ninth

12   Circuit, however, has held an action or policy constitutes a substantial burden if it constitutes a

13   "significantly great restriction or onus on any exercise of religion, whether or not compelled by, or

14   central to, a system of religious belief of a person, including a religious assembly or institution."

15   San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034-35 (9th Cir. 2004) (internal

16   quotations omitted).  As further defined by the Ninth Circuit, a substantial burden "must be more

17   than an inconvenience"; it must prevent the plaintiff "from engaging in [religious] conduct or

18   having a religious experience."  Navajo Nation v. United States Forest Serv., 479 F.3d 1024, 1033

19   (9th Cir.2006) (internal quotations and citations omitted).

20        Defendants Thomas and Tucker contend the restriction on Plaintiff's ability to attend

21   Jumu'ah and Ramadan Magrib services during the time periods at issue was not a substantial burden

22   on Plaintiff's exercise of religion because he was not prevented from practicing his Muslim faith.

23   Even if he could not congregate with other inmates to perform the Dhur prayer at Jumu'ah services

24   every Friday or to attend group Ramadan Magrib services, he nevertheless could fulfill his religious

25   obligation by performing these prayers alone in his cell or elsewhere.  In response, Plaintiff argues

26   there is no alternative practice that can replace his obligation to attend Jumu'ah services every

27   Friday or group Ramadan Magrib services.

28

**United States District Court**
For the Northern District of California

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25
26
27
28

It is undisputed Plaintiff was restricted from attending Jumu'ah and Ramadan Magrib services during the time periods at issue.  Plaintiff has not established, however, that this restriction prevented him from engaging in religious conduct.  Importantly, Plaintiff was not prevented from performing in his own cell the Dhur prayer on October 15, 2004 or the Ramadan Magrib prayer on October 16, 2004.  Although congregating with other Muslims each Friday to perform the Dhur prayer at a Jumu'ah service or attending group Ramadan Magrib services might be the preferred ways for Plaintiff to practice his faith, he has not shown that his inability to do so resulted in a "significantly great" restriction or onus on the exercise of his religion.  Despite the actions of Defendants Thomas and Tucker, Plaintiff retained his ability to perform his prayers, to attend Jumu'ah and Ramadan Magrib services when they were available to him, and to engage in other religious educational and counseling activities.  For these reasons, the Court finds Plaintiff has not met his burden of coming forward with evidence that Defendants Thomas's and Tucker's actions constituted a substantial burden on his exercise of religion.  See, e.g., Mohammad v. Beard, 2007 WL 1439051, *10 (W.D. Pa. 2007)  (finding denial of prayer rug did not constitute substantial burden on Muslim prisoner's religious beliefs where prisoner showed only it was essential he pray on clean area, not that he pray on prayer rug); Greene v. Solano County Jail, 2006 WL 2067056, *9 (E.D. Cal. 2006) (finding failure to provide group worship services did not substantially burden prisoner's ability to exercise his religion, and effect on prisoner's exercise of religion was "only incidental," where prisoner was not required to act contrary to his religious beliefs, and alternate means remained available to prisoner to exercise his religious beliefs); cf. Warsoldier, (finding prison officials substantially burdened prisoner's religious practice by subjecting him to numerous punishments because he refused to cut his hair).[7]

---

[7] In light of the Court's resolution of Plaintiff's RLUIPA claim on the grounds discussed, the Court has not considered whether RLUIPA permits suit against Defendants Thomas and Tucker in their individual capacities. Compare Boles v. Neet, 402 F. Supp.2d 1237, 1240 (D. Colo. 2005) (holding RLUIPA actions may be brought against governmental entity but do not appear to be permitted against officials in their individual capacities), with Guru Nanak Sikh Society of Yuba City v. Sutter, 326 F. Supp.2d 1128, 1136 (E.D. Cal. 2003) (holding RLUIPA permits actions against officials at least in their official capacities).  Likewise, the Court has not considered whether money damages can be recovered for RLUIPA violations. Compare Boles, 402 F. Supp.2d at 1241

1    In sum, Plaintiff has not established that Defendants Thomas and Tucker's actions of not

2    allowing Jumu'ah or Ramadan Magrib services during the time periods at issue substantially

3    burdened the practice of his religion under RLUIPA.  Accordingly, Defendants Thomas and Tucker

4    are entitled to summary judgment on Plaintiff's RLUIPA claim.

5    ### 3.   **Qualified Immunity**

6    Defendants Thomas and Tucker claim, in the alternative, that even if Plaintiff's allegations

7    revealed a constitutional violation, qualified immunity would protect them from liability for

8    Plaintiff's First Amendment and RLUIPA claims because it would not have been clear to a

9    reasonable official that their conduct was unlawful in the situation confronted.

10   The defense of qualified immunity protects "government officials . . . from liability for civil

11   damages insofar as their conduct does not violate clearly established statutory or constitutional

12   rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818

13   (1982).  The rule of qualified immunity provides ample protection to "all but the plainly

14   incompetent or those who knowingly violate the law;" the defendants can have a reasonable, but

15   mistaken, belief about the facts or about what the law requires in any given situation.  Saucier v.

16   Katz, 533 U.S. 194, 202 (2001) (internal quotation marks and citation omitted).  The threshold

17   question in qualified immunity analysis is:  "Taken in the light most favorable to the party asserting

18   the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at

19   201.  A court considering a claim of qualified immunity must determine whether the plaintiff has

20   alleged the deprivation of an actual constitutional right and whether such right was "clearly

21   established."  Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818 (2009).  Where there is no

22   clearly established law that certain conduct constitutes a constitutional violation, the defendant

23   cannot be on notice that such conduct is unlawful.  Rodis v. City and County of S.F., 558 F.3d 964,

24   970 (9th Cir. 2009).  The relevant, dispositive inquiry in determining whether a right is clearly

25   established is whether it would be clear to a reasonable defendant that his conduct was unlawful in

26

27

28   (holding damages not available), with Bess v. Alameida, 2007 WL 2481682, *21 (E.D. Cal. 2007)
     (holding damages available).

22

the situation he confronted.  Saucier, 533 U.S. at 202.

On these facts, viewed in the light most favorable to Plaintiff, Defendants Thomas and Tucker prevail as a matter of law on their qualified immunity defense because the record establishes no violation of his rights under the First Amendment and RLUIPA.  See Harlow, 457 U.S. at 818. However, even if a constitutional violation had occurred with respect to Plaintiff's claims, in light of clearly established principles at the time of the incident, Defendants Thomas and Tucker could have reasonably believed their conduct was lawful.  See Estate of Ford, 301 F.3d at 1049-50.

Even though Defendants Thomas and Tucker's actions of not allowing Plaintiff to participate in Jumu'ah and Ramadan Magrib services during the time periods at issue may have been unreasonable, Plaintiff has not provided any clearly established law indicating that it is unconstitutional for a reasonable officer to deny an inmate Jumu'ah services if the Muslim Chaplain is unavailable or to deny him group Ramadan Magrib services during an emergency.  See O'Lone, 482 U.S. at 348 (it is not clearly established that a reasonable officer could not curtail religious exercise to maintain prison security).  Therefore, Defendants Thomas and Tucker would not have been on notice that their conduct was unlawful.  Defendants Thomas and Tucker are entitled to qualified immunity with respect to Plaintiff's First Amendment and RLUIPA claims and thus are entitled to summary judgment as a matter of law.  Accordingly, Defendants' motion for summary judgment as to these claims is GRANTED.[8]

**CONCLUSION**

For the foregoing reasons,

1.    Defendants' motion to dismiss (docket no. 26) is GRANTED, and Plaintiff's First Amendment and RLUIPA claims against Defendants Beguhl and Binkele are DISMISSED without prejudice as unexhausted.

2.    Defendants' motion for summary judgment (docket no. 26) is GRANTED as to Plaintiff's First Amendment and RLUIPA claims against Defendants Thomas and Tucker.

---

[8]  Because the Court has granted Defendants' dispositive motions, it need not address their alternative arguments relating to the Eleventh Amendment barring suits for damages against Defendants in their official capacities or barring monetary damages under RLUIPA.  (Supra note 6.)

23

**United States District Court**
For the Northern District of California

1

        3.      The Clerk of the Court shall enter judgment in favor of Defendants Thomas and

2   Tucker, terminate all pending motions, and close the file.

3

4

5       4.      This Order terminates Docket no. 26

6       IT IS SO ORDERED.

7   DATED:  March 31, 2010

8                                                       SAUNDRA BROWN ARMSTRONG
                                                        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

P:\PRO-SE\SBA\CR.06\Parnell7662.grantMSJ.frm                    24

1

2

3

4

5   UNITED STATES DISTRICT COURT
    FOR THE
6   NORTHERN DISTRICT OF CALIFORNIA

7

8   ARTHUR PARNELL III,
                                              Case Number: CV06-07662 SBA
9              Plaintiff,
                                              **CERTIFICATE OF SERVICE**
10
      v.
11
12  A. TUCKER et al,

13             Defendant.
                                        /
14

15  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
16  Court, Northern District of California.

17  That on April 7, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
18  copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
19  located in the Clerk's office.

20

21

22  Arthur  Parnell T50222
23  Salinas Valley State Prison
    P.O. Box 1050
24  Soledad,  CA 93960-1050

25

26  Dated: April 7, 2010

27                                      Richard W. Wieking, Clerk
                                        By: LISA R CLARK, Deputy Clerk
28

P:\PRO-SE\SBA\CR.06\Parnell7662.grantMSJ.frm          25